AZRA Z. MEHDI (SBN 220406)
THE MEHDI FIRM, PC
One Market
Spear Tower, Suite 3600
San Francisco, California 94105
Telephone: (415) 293-8039
Facsimile: (415) 293-8001
Email: azram@themehdifirm.com

*Local Counsel for Plaintiff*

ALBERT M. MYERS (to seek *Pro Hac Vice* admission)
MELINDA A. NICHOLSON (to seek *Pro Hac Vice* admission)
MICHAEL J. PALESTINA (to seek *Pro Hac Vice* admission)
KAHN SWICK & FOTI, LLC
206 Covington Street
Madisonville, LA 70447
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TROY LOWRY, derivatively on behalf of VIOLIN MEMORY, INC., <br><br> Plaintiff, <br><br> vs. <br><br> DONALD G. BASILE, CORY JOSEPH SINDELAR, DIXON RAYMOND DOLL, JR., JEFFREY J. NEWMAN, HOWARD ALLEN BAIN III, LAWRENCE J. LANG, DAVID BRADLEY WALROD, and MARK NEAL ROSENBLATT, <br><br> Defendants, <br><br> -and- <br><br> VIOLIN MEMORY, INC., <br><br> Nominal Defendant. | CASE NO. CV 13 5768 <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff, through his undersigned counsel, submits this Verified Shareholder Derivative Complaint ("Complaint") in the name and on behalf of nominal defendant Violin Memory, Inc. ("Violin Memory" or the "Company") against certain directors and/or officers of Violin Memory named herein (the "Defendants"). Plaintiff bases his allegations on personal knowledge as to his own acts, and on information and belief as to all other allegations, based upon due investigation by counsel, including: (a) review and analysis of public filings made by Violin Memory and other persons with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases, financial statements, and other publications caused to be disseminated by certain of the Defendants and other persons; (c) review and analysis of news articles, shareholder communications, and postings on Violin Memory's website concerning the Company's public statements; and (d) review and analysis of other publicly available information concerning Violin Memory and other persons.

## INTRODUCTION AND OVERVIEW

1.      Violin Memory is a computer systems data storage provider. The Company provides products and services that employ solid-state "flash" memory chips to replace the magnetic hard-disk-based memory arrays that large businesses have traditionally used to make their enterprise-wide software applications run faster. The Company's flash-based memory arrays are provided in a range of sizes, from tens of terabytes up to hundreds of petabytes and are said to significantly speed up database operations by a factor ranging from 10 to 100.

2.      Solid-state memory, which Violin Memory uses in its drives, is significantly faster than traditional storage devices. Unlike traditional hard drives, which read data off of a spinning magnetic disk, there aren't any moving parts in a solid state drive, which means it uses less electricity, produces less heat, and is less affected by vibration. Violin Memory claims that its devices eliminate 80 percent of the hardware (equipment) required for comparable memory, as well as 90 percent of the power requirements.

3.      The market for such solid-state storage devices is more than $2 billion per year. But Violin Memory's annual sales have never exceeded $74 million, and it has consistently operated at a deep and growing loss. Operating losses of $6.5 million in the first quarter of fiscal

- 1 -

2012 (ending April 30, 2011) had, by the second quarter of fiscal 2014 (ending July 31, 2013), mushroomed to $30.3 million. The Company faces stiff competition from much better-financed and more experienced players, such as Hewlett-Packard Company (3PAR 7450), Cisco Systems (Whiptail), Dell Computer (Compellent), EMC Corporation (XtremeIO, VNX), NetApp, Inc. (EP540/550, Flashray), IBM (FlashSystem), Hitachi Data Systems Corp. (Flash Accelerator), Nimbus Data, Pure Storage, SolidFire, Inc., and Oracle Corporation.

4.     Violin Memory completed an initial public offering ("IPO" or "Offering") of common stock on September 27, 2013. In connection with the Offering, Violin Memory filed a Form S-1 registration statement with the SEC on August 26, 2013. Thereafter, on September 16, 2013, the Company filed its final Form S-1/A with the SEC (the "Registration Statement"). On September 27, 2013, Violin Memory filed its official prospectus ("Prospectus") for the IPO, forming part of the Registration Statement.   The Registration Statement, including the Prospectus, was declared effective on September 26, 2013.

5.     The IPO was priced at $9.00 per share. By the end of its first day of trading on September 27, 2013, Violin Memory's stock price had dropped to $7.02 per share—a 22% decline—representing a clearly failed public offering. Violin Memory received proceeds of only $145.8 million from the Offering, after deducting underwriting costs. At $9.00 per share, this impliedly valued the entire Company at $740 million. (In contrast, in the fall of 2012, when the Company had filed a registration statement with the SEC for an IPO that was thereafter aborted, investors expected the IPO to occur at a price that would value Violin Memory at more than $2 billion.   Moreover, venture capital financings from 2009 to 2012 had impliedly valued the Company at approximately $850 million.)

6.     The IPO was rushed into existence to benefit the Defendants rather than the Company or its shareholders. Indeed, Chief Executive Officer, Defendant Donald G. Basile ("Basile") received a bonus of some 2.5 million shares of the Company's common stock merely for closing the IPO before September 30, 2013, irrespective of the Company's prospects at the time and the advisability of completing the IPO in the circumstances. Indeed, Basile received a total of 5 million shares of Violin Memory common stock in connection with the IPO, worth $45

- 2 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

million at the offering price of $9 per share. Defendants also caused Basile and two other Defendants who are officers of the Company to receive nearly $26 million in purported "compensation" for fiscal 2013 (ending January 31, 2013)—at a time when the Company's entire annual revenues were less than $74 million and it had over $109 million in losses.

7.      Defendants timed the IPO at a time when they could report periodic revenues that suggested a banner year for the fiscal year ending January 31, 2014 on the strength of sales to both the federal government and to private business enterprises (enterprise sales). However, as the recent third-quarter results and fourth-quarter projections revealed, Violin Memory's losses are growing faster than its revenues (in large part because its sales and marketing expenses have spiraled out of control); it has suffered an immediate and devastating fall-off in government orders in connection with the shutdown of the federal government that was proceeding even while the Registration Statement was being promulgated (with no identifiable prospect for restoration); and even after receiving the proceeds from the Offering, the Company has only enough cash to keep its doors open for another twelve months or less. And in fact, the Company faces a significant and growing risk that it will be unable to continue as a going concern. Defendants were well aware of these circumstances yet completed the IPO, on the basis of false and misleading statements, anyway.  As a result, the Company has both missed a unique opportunity to raise substantially more cash (correspondingly valuing the entire Company at a substantially higher number) and exposed itself to significant liability and damages from securities class action lawsuits and other damages.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 (diversity of citizenship) in that Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

9.      The Court has personal jurisdiction over each of the Defendants and Nominal Defendant Violin Memory because each is either a corporation that conducts business in and maintains operations in this District or an individual with sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional

- 3 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

notions of fair play and substantial justice. Moreover, each Defendant has had extensive contacts with California as a director and/or officer of Violin Memory or otherwise, which makes the exercise of personal jurisdiction over them proper.

10.     Venue is proper in this Court because Violin Memory has a substantial presence in California, and is headquartered in this District.

## PARTIES

### A.     Plaintiff

11.     Plaintiff Troy Lowry is and, at all relevant times, has been a continuous owner and holder of shares of stock of Violin Memory. Mr. Lowry held shares of preferred stock from 2007 until 2009, and he has held shares of common stock from 2009 (when his preferred shares were converted into common) until the present. Mr. Lowry is a citizen of Pennsylvania.

### B.     Nominal Defendant

12.     Nominal Defendant Violin Memory is a corporation organized and existing under the laws of the State of Delaware with its principal executive offices located at 4555 Great America Parkway, Santa Clara, California.

13.     Violin Memory's shares trade publicly on the NYSE stock market under the ticker symbol "VMEM."

### C.     Defendants

14.     Defendant Donald G. Basile is President of Violin Memory and has served as the Company's Chief Executive Officer ("CEO") since February 2009 and as a member of the Company's Board of Directors since May 2009. Previously, Basile was the CEO of Fusion-io, Inc. ("Fusion-io"), a provider of flash memory devices that compete with Violin Memory's, from February 2008 until being terminated for cause in February 2009, and as Chairman of the Board of Fusion-io from August 2006 until being terminated in August 2009. Basile is a principal investor in Iron Capital Partners ("Iron Capital"), which provided venture capital financing to Violin Memory in April 2009. In exchange for his purported trust, loyalty, and fidelity to Violin Memory, Basile received $18,910,938 in salary, bonuses, stock awards, option awards, and other compensation in fiscal 2013 (ending January 31, 2013). In connection with the IPO of Violin

- 4 -

Memory common stock in September 2013, Basile received 5 million shares, worth $45 million at the IPO price of $9.00 per share and worth approximately $16 million even at the current depressed market price. Basile signed the Registration Statement on behalf of Violin Memory. Basile is a citizen of California.

15.     Defendant Cory Joseph Sindelar ("Sindelar") has served as Violin Memory's Chief Financial Officer ("CFO") since 2011. In exchange for his purported trust, loyalty, and fidelity to Violin Memory, Sindelar received approximately $1,800,200 in salary, bonuses, stock awards, option awards, and other compensation in fiscal 2013. Sindelar signed the Registration Statement on behalf of Violin Memory. Sindelar is a citizen of California.

16.     Defendant Dixon Raymond Doll, Jr. ("Doll") has served as Violin Memory's Chief Operating Officer ("COO") and as a member of the Company's Board of Directors since July 2009. Doll was the Senior Vice President of Sales and Corporate Development at Fusion-io from February 2008 to February 2009, serving under and working closely with Basile in that position. In exchange for his purported trust, loyalty, and fidelity to Violin Memory, Doll received approximately $4,960,200 in salary, bonuses, stock awards, option awards, and other compensation in fiscal 2013. Doll signed the Registration Statement on behalf of Violin Memory. Doll is a citizen of California.

17.     Defendant Jeffrey J. Newman ("Newman") has served as a member of Violin Memory's Board of Directors since March 2009. Newman is the CEO of Catalyst Operating, LLC ("Catalyst"), a firm which provides consulting services to new technology companies in Silicon Valley. In fiscal 2012 (ending January 31, 2012) and fiscal 2013, Catalyst received approximately $500,000 in revenues from Violin Memory. Newman also has served on the Board of Directors of RiverMeadow Software, Inc. ("RiverMeadow"), a provider of cloud migration solutions, since March 2012, and is its current Chairman of the Board. In August 2012, Violin Memory purchased 866,325 shares of Series A-1 convertible preferred stock of RiverMeadow for consideration of $3.0 million representing 9% of the outstanding stock of RiverMeadow. During fiscal 2013, Violin Memory had product sales to RiverMeadow of $1.4 million. In addition, Newman and his affiliated entities provide services to RiverMeadow.

- 5 -

Collectively. Newman—together with Basile, Defendant Mark Neal Rosenblatt, and Violin Memory—own 23% of the outstanding stock of RiverMeadow. Newman signed the Registration Statement on behalf of Violin Memory. Newman is a citizen of California.

18.     Defendant Howard Allen Bain III ("Bain") has served as a member of Violin Memory's Board of Directors since October 2012 and as Chairman of the Board since August 2013. Bain is the Chair of Violin Memory's Audit Committee and serves on its Compensation Committee. In exchange for his purported trust, loyalty, and fidelity to Violin Memory, Bain received stock and/or option awards having a fair market value of $750,000 in fiscal 2013, solely for his service as a director. Bain signed the Registration Statement on behalf of Violin Memory. Bain is a citizen of California.

19.     Defendant Lawrence J. Lang ("Lang") has served as a member of Violin Memory's Board of Directors since May 2010. He is a member of Violin Memory's Audit Committee and its Compensation Committee. Lang signed the Registration Statement on behalf of Violin Memory. Lang is a citizen of California.

20.     Defendant David Bradley Walrod ("Walrod") has served as a member of Violin Memory's Board of Directors since September 2011. He is the Chair of Violin Memory's Compensation Committee and a member of its Audit Committee. In exchange for his purported trust, loyalty, and fidelity to Violin Memory, Walrod received stock and/or option awards having a fair market value of $750,000 in fiscal 2013, solely for his service as a director. Walrod signed the Registration Statement on behalf of Violin Memory. Walrod is a citizen of California.

21.     Defendant Mark Neal Rosenblatt ("Rosenblatt") served as a member of Violin Memory's Board of Directors from September 2006 until he resigned from the Board in connection with the IPO. While a director, Rosenblatt served as a member of Violin Memory's Audit Committee. Rosenblatt signed the Registration Statement on behalf of Violin Memory. Rosenblatt is a citizen of New York.

22.     Defendants Basile, Doll, Newman, Bain, Lang, and Walrod are collectively referred to herein as the "Director Defendants."

23.     Defendants Bain, Lang and Walrod are collectively referred to herein as the

- 6 -

1 "Audit Committee Defendants."

2     24.    Defendants Bain, Lang, and Walrod are collectively referred to herein as the

3 "Compensation Committee Defendants."

4             **GENERAL FIDUCIARY DUTIES OF DEFENDANTS**

5     25.    The Defendants had stringent fiduciary obligations to Violin Memory and its

6 shareholders.

7     26.    By reason of their positions as directors, officers, and/or fiduciaries of Violin

8 Memory and because of their ability to control its business and corporate affairs, the Defendants

9 owed Violin Memory and its shareholders fiduciary obligations of loyalty, good faith, due care,

10 disclosure, candor, and oversight, and were and are required to use their utmost ability to control

11 and manage Violin Memory in a fair, just, honest and equitable manner.  The Defendants were

12 and are required to act in furtherance of the best interests of Violin Memory and its shareholders

13 so as to benefit all shareholders equally and not in furtherance of their personal interests or

14 benefit.

15     27.    Each director and officer of the Company owes to Violin Memory and its

16 shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration

17 of the affairs of the Company and in the use and preservation of its property and assets, and to

18 uphold the highest obligations of fair dealing.  In addition, the Defendants had a duty to promptly

19 disseminate accurate and truthful information with regard to the Company's true financial

20 condition and prospects, including in the Company's Registration Statement and Prospectus.

21     28.    The Defendants, because of their positions of control and authority as directors

22 and/or officers of Violin Memory, were able to, and did, directly and/or indirectly, exercise

23 control over the wrongful acts complained of herein, as well as the contents of the various public

24 statements issued by the Company.  Because of their advisory, executive, managerial, and

25 directorial positions with Violin Memory, each of the Defendants had access to adverse, non-

26 public information about the financial condition, operations, and improper representations of

27 Violin Memory.

28     29.    At all times relevant hereto, each of the Defendants was the agent of each of the

- 7 -

other Defendants and of Violin Memory, and was at all times acting within the course and scope of such agency.

30.     To discharge their duties, the officers and directors of Violin Memory were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Violin Memory were required to, among other things:

     a. refrain from acting upon material, inside, corporate information to benefit themselves;

     b. conduct the affairs of the Company in an efficient, businesslike manner, so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the Company's value;

     c. properly and accurately guide shareholders and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's accounting and financial reporting would be true and accurate at all times;

     d. ensure that the Company's revenue projections were based on appropriate support and documentation, and were routinely checked for accuracy;

     e. ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

     f. ensure that there were sufficient checks and balances in Violin Memory's accounting and finance functions, and related functions, to prevent accounting irregularities, internal control problems, and/or overstatement of income, revenues and cash flow; and

     g. ensure that no inaccurate financial information about Violin Memory was released to the public that would tend to artificially inflate Violin Memory's stock, and that

- 8 -

would thus cause corresponding or greater harm to the Company's value when the truth was revealed.

31.     The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Violin Memory, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders. The Defendants were aware, or should have been aware, that those violations, absences of good faith, and the reckless disregard of duties posed a risk of serious injury to the Company. The conduct of the Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining Defendants who collectively comprised Violin Memory's Board.

32.     Because of their positions with the Company, and their access to material non-public information available to them but not to the public, Violin Memory, through the Defendants, knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. As a result of Defendants' illegal actions and course of conduct, the Company, among other things, now is subject to multiple shareholder lawsuits that allege violations of both federal and state law. As a result, Violin Memory has expended, and will continue to expend, significant sums of money.

## SPECIFIC CORPORATE DUTIES OF DEFENDANTS

33.     Violin Memory holds itself to specific corporate governance principles beyond the requirements of law. For example, in its Registration Statement, Violin Memory described the duties undertaken by its Board of Directors, and the active oversight role the Board played in its business affairs:

**Role of the Board in Risk Oversight**

One of the key functions of our board of directors is *informed oversight of our risk management process*. Our board of directors does not have a standing risk management committee, but rather administers this oversight function directly through the board of directors as a whole, as well as through various board of directors, standing committees that address risks inherent in their respective areas of oversight. *In particular, our board of directors is responsible for monitoring and assessing strategic risk exposure.* [Emphases added.]

- 9 -

34.     Violin Memory admits that a majority of its Board of Directors should satisfy the "independent director" standards of the New York Stock Exchange, where it is listed. For example, the Company has promulgated "Corporate Governance Guidelines" which state as follows:

> *Board Independence* – The Board believes in having a majority of independent directors of the Board. As such, a majority of the directors *shall* be "independent directors" as defined by the rules promulgated by the New York Stock Exchange, and shall satisfy all applicable independence requirements under the federal securities laws or rules thereunder. [Emphasis added.][1]

35.     In addition, the Defendants are also required to conform their conduct to the Company's more specific Code of Business Ethics and Conduct. That Code of Conduct applies to "all of the employees of the Company," who were expected to read and understand the Code, uphold its standards in their day-to-day work and in their interactions with others, and to comply with all applicable policies and procedures. From the outset, the Code makes clear what is expected of all directors, officers and employees: "Company policy requires that our business activities comply with *both the letter and the spirit of all applicable laws, rules and regulations.*" (Emphasis added.)

36.     The Code of Conduct specifically requires "honest and accurate recording and reporting of information in order to make responsible business decisions." In particular,

> All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls. All Company business data, records and reports must be prepared truthfully and accurately. . . .

> Employees who contribute to or prepare the Company's financial statements, public filings, submissions or communications should do so in accordance with the following guidelines:

> ▪ All accounting records, as well as reports produced from these records, must be prepared in accordance with the laws of each applicable jurisdiction.

> ▪ All records must fairly and accurately reflect the transactions or occurrences to which they relate.

---

[1]     As discussed herein, through the actions of its Board, Violin Memory is admittedly *in violation* of these director independence standards. *See infra,* ¶¶ 117-119.

- 10 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- All records must fairly and accurately reflect, in reasonable detail, the Company's assets, liabilities, revenues and expenses.

- The Company's accounting records must not contain any false or intentionally misleading entries.

37. The Code of Conduct, which is available on Violin Memory's website, contains provisions allowing—indeed, requiring—any employee to report violations of the Code to a person in a position of higher authority. In addition, employees are encouraged to report violations to the Chairman of the Company's Audit Committee "at any time." The Code purports to provide contact information for the Audit Committee Chair, but does not, in fact, do so. Indeed, the current version of the Code on the Company's website states as follows:

Employees may report evidence of wrongdoing, complaints, or concerns relating to accounting and auditing matters to the Chairman of the Audit Committee at any time. This report may be made in person or in writing, and may be anonymous, at the employees' discretion, through the following:

- Contact the Chairman of the Audit Committee by email at _____.

- Contact the Chairman of the Audit Committee by mail at Violin Memory, Inc., Attn: Audit Committee Chairman (This correspondence will be forwarded directly to the Chairman of the Audit Committee.)

- Anonymous hotline at [XYZ].

(Blank line, "XYZ" and highlighting in the original.)

38. Violin Memory also maintains a Code of Ethics specific to "Senior Financial Officers," which includes the CEO, President, COO, CFO, and controller of the Company, as well as "key management employees (including other senior financial officers) who have been identified by the Board of Directors" (collectively defined within the code as "Officers"). This policy requires as follows:

- The Officers are responsible for full, fair, accurate, timely and understandable disclosure in the reports and documents that the Company files with, or submits to, the Securities and Exchange Commission and in other public communications made by the Company. . . .

- Each Officer shall promptly bring to the attention of the Audit Chair any information he or she may have concerning (a) significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal control over financial reporting.

- 11 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- ▪ Each Officer shall act with honesty and integrity in the performance of his or her duties and shall comply with laws, rules and regulations of federal, state and local governments and other private and public regulatory agencies that affect the conduct of the Company's business and the Company's financial reporting.

- ▪ Each Officer shall promptly bring to the attention of the Audit Chair any information he or she may have concerning evidence of a material violation of the securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof, or any violations of this Code.

39. In addition to the above corporate governance principles, the Defendants who are or were also members of Board committees are also required to conform their conduct to the more specific requirements set forth in the respective charters of each such Committee. This point, too, was enshrined in the discussion of corporate governance in the Registration Statement:

### Board Committees

We have established an audit committee, compensation committee and nominating and corporate governance committee. We believe that the composition of these committees meets the criteria for independence under, and the functioning of these committees complies with the applicable requirements of, the Sarbanes-Oxley Act, the current rules of the and SEC rules and regulations. We intend to comply with future requirements as they become applicable to us. Each committee has the composition and responsibilities described below:

*Audit committee* – Messrs. Bain, Rosenblatt and Walrod serve on our audit committee. Mr. Bain is the chairperson of this committee. Following this offering, our audit committee will consist of Messrs. Bain and Walrod, with Mr. Bain continuing to serve as the chairperson of this committee. Our audit committee assists our board of directors in fulfilling its legal and fiduciary obligations in matters involving our accounting, auditing, financial reporting, internal control and legal compliance functions, and is directly responsible for the approval of the services performed by our independent accountants and reviewing of their reports regarding our accounting practices and systems of internal accounting controls. Our audit committee also oversees the audit efforts of our independent accountants and takes actions as it deems necessary to satisfy itself that the accountants are independent of management. *Our audit committee is also responsible for monitoring the integrity of our financial statements and our compliance with legal and regulatory requirements as they relate to financial statements or accounting matters.* Our board of directors has determined that each of the members of our audit committee is an audit committee financial expert, as defined by the rules promulgated by the SEC, and has the requisite financial sophistication as defined under the applicable rules and regulations of the NYSE.

- 12 -

*Compensation committee* – Messrs. Bain, Lang and Walrod serve on our compensation committee. Mr. Walrod is the chairperson of this committee. Our compensation committee assists our board of directors in meeting its responsibilities with regard to oversight and determination of executive compensation and assesses whether our compensation structure establishes appropriate incentives for officers and employees. Our compensation committee reviews and makes recommendations to our board of directors with respect to our major compensation plans, policies and programs. In addition, our compensation committee reviews and makes recommendations for approval by the independent members of our board of directors regarding the compensation for our executive officers, establishes and modifies the terms and conditions of employment of our executive officers and administers our stock option plans.

*Nominating and corporate governance committee* – Messrs. Bain, Lang and Walrod serve on our nominating and corporate governance committee. Mr. Walrod is the chairperson of this committee. Our nominating and corporate governance committee is responsible for making recommendations to our board of directors regarding candidates for directorships and the size and composition of the board of directors. In addition, our nominating and corporate governance committee is responsible for overseeing our corporate governance guidelines, and reporting and making recommendations to the board of directors concerning corporate governance matters. [Emphasis added.]

40.     Correspondingly, the Charter of Violin Memory's Audit Committee specifies that the "purpose of the Audit Committee . . . is to assist the Board of Directors in its oversight of: (a) the integrity of the Company's financial statements [and] (b) the Company's compliance with legal and regulatory requirements." In addition, the Charter imposes the following duties on the Audit Committee, in a section labeled "Oversight of Company Financial Statements and Internal Controls":

- Review and discuss the Company's annual audited financial statements and quarterly financial statements with management and the independent auditors, including the Company's disclosures under the section entitled "Managements' Discussion and Analysis of Financial Condition and Results of Operations" in the Company's reports filed with the SEC. . . .

- Review and discuss with management and the independent auditors the Company's earnings press releases, and discuss generally with management the nature of any additional financial information or earnings guidance to be provided publicly and/or to ratings agencies. . . .

- Based on its review and discussions with management and the independent auditors, recommend to the Board of Directors whether the Company's audited financial statements should be included in the Company's Annual Report on Form 10-K. . . .

- Review and discuss with management and the independent auditors the adequacy and effectiveness of the Company's internal control over financial reporting (including any significant deficiencies, material

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

weaknesses and significant changes in internal control over financial reporting reported to the Committee by management and any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting and any special audit steps adopted in light of material control deficiencies) and the effectiveness of the Company's disclosure controls and procedures.

- Review with the Board of Directors any issues that arise with respect to the quality of integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements and the performance and independence of the Company's independent auditors.

41. In short, it is the Audit Committee's responsibility to ensure the integrity of Violin Memory's system of internal financial controls, such that actions like those at issue in this case do not occur.

42. Similarly, the Charter of the Company's Compensation Committee also imposes specific duties on members of that Committee:

- Review and make recommendations to the Board of Directors of the corporate goals and objectives relevant to the compensation of the Chief Executive Officer ("CEO") and other executive officers.

- Evaluate the performance of the CEO and the executive officers of the Company in light of such goals and objectives at least annually and communicate the results to the Board of Directors and to the CEO.

- Based on the evaluations referred to above, review and make recommendations to the independent members of the Board of Directors regarding the compensation levels for the CEO and other executive officers of the Company, including, as applicable, (i) base salary, (ii) bonus, (iii) long-term incentive and equity compensation, and (iv) any other compensation, perquisites, and special or supplemental benefits. . . .

- Establish and modify the terms and conditions of employment of the CEO and other executive officers of the Company, by contract or otherwise.

- Determine, within parameters that may be established by the independent and disinterested members of the entire Board of Directors, the provisions of any contracts for the CEO and other executive officers of the Company that will govern the situations in which severance payments will be due upon a change in control.

43. Thus, the Compensation Committee's responsibility is to make reasonable determinations of overall executive compensation at Violin Memory, and to ensure that such compensation is reasonable and appropriate given the Company's actual performance and financial situation.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

44. In committing the wrongful acts alleged herein, the Defendants have pursued, or

- 14 -

1  joined in the pursuit of, a common course of conduct. They have acted in concert with and
2  conspired with one another in furtherance of their common plan or design. In addition to
3  pursuing the wrongful conduct that gives rise to their primary liability, the Defendants also aided
4  and abetted, and/or assisted, each other in breach of their respective duties.

5      45.     Defendants collectively and individually initiated a course of conduct that was
6  designed to and did conceal that Violin Memory's stock was materially and systematically
7  overstated during the relevant period.

8      46.     The purpose and effect of the Defendants' conspiracy, common enterprise, and/or
9  common course of conduct was, among other things, to disguise the Defendants' violations of
10 state law, including breaches of fiduciary duty, abuse of control, gross mismanagement, waste of
11 corporate assets and unjust enrichment; and to conceal adverse information concerning the
12 Company's future sales and continued growth.

13     47.     The Defendants accomplished their conspiracy, common enterprise, and/or
14 common course of conduct by purposefully or recklessly releasing improper statements on the
15 Company's behalf. Because the actions described herein occurred under the Board's authority,
16 each of the Defendants played a direct, necessary, and substantial part in the conspiracy,
17 common enterprise, and/or common course of conduct complained of herein.

18     48.     Each of the Defendants aided and abetted and rendered substantial assistance in
19 the wrongs complained of herein. In taking such actions to substantially assist the commission
20 of the wrongdoing complained of herein, each of the Defendants acted with knowledge of the
21 primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was
22 aware of his overall contribution to and furtherance of the wrongdoing.

23                          **SUBSTANTIVE ALLEGATIONS**

24 **A.    Background**

25     49.     As a start-up company, Violin Memory has always been heavily dependent on
26 cash raised from investors. Plaintiff invested $228,000 in the Company in 2006, based on
27 various representations by management about the Company's prospects. The Company
28 completed its Series A financing in 2010, raising $10 million. Two more rounds of financing in

- 15 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

2011 raised an additional $75 million. Series D financing raised $80 million in March 2012, impliedly valuing the entire Company at approximately $800 million.

50. Defendants, who under CEO Basile have managed Violin Memory since February 2009, have made false and misleading statements to shareholders, potential investors, and the general public on a systematic basis beginning with Basile's tenure in 2009 and continuing to the present. During this relevant period, they have consistently misrepresented the Company's actual revenues, projected revenues, competitive position, and prospects to shareholders.

**B. Defendant Basile's Reputation for Misappropriation and Deceptiveness**

51. As of February 2009, Basile was officially the CEO of Fusion-io, a company which makes flash memory devices that compete with Violin Memory's. Fusion-io had recently recruited Steve Wozniak, the co-founder of Apple Computer, to be its chief scientist—an appointment that was viewed as a significant "coup" for Fusion-io in the financial press. Indeed, in an article entitled "The man who wooed Woz" on February 13, 2009, *Fortune* magazine reported that credit for recruiting Mr. Wozniak, first to a position on Fusion-io's advisory board and then to Chief Scientist, was entirely due to Basile:

> **Basile** says he and Fusion-io first approached Wozniak about the company in early 2008 after hearing the personal computing pioneer speak at an event. **Basile** recalls that Wozniak was initially skeptical of Fusion-io's proposition, but was intrigued enough to want to learn more. **Basile** kept sending him information, and eventually persuaded him to join the advisory board.
>
> But according to **Basile** both he and Wozniak realized the company would benefit from a deeper relationship. "It was all about time, many of us have been on boards and it is a very different time commitment than working for a company," **Basile** says. "It was very exciting that he would change his time commitment; it's a big endorsement for the concept the company has."
>
> * * *
>
> Wozniak's willingness to go back to work underscores **Basile's** powers of persuasion. A twenty-year tech and telecom veteran who has worked in startups and big corporations such as IBM and AT&T, **Basile** nonetheless didn't know Wozniak when he first pitched him on Fusion-io. But friends say his smarts and straight-shooter demeanor make him incredibly convincing, especially when it comes to promoting the merits of technologies he believes in. [Emphases added.]

52. The problem with Basile's claims was that they were not true. After Basile left Fusion-io as CEO ten days after the *Fortune* article appeared, to be replaced by general counsel David Bradford, Fusion-io's chief marketing officer Rick White was reported by *The Register*, a

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    global online technical journal for IT professionals, on March 4, 2009 to have disclosed that it
2    was Mr. Bradford, not Basile, who had brought Wozniak to Fusion-io and persuaded him to
3    become its chief scientist.

4        53.     Basile was terminated for cause by Fusion-io on February 23, 2009. According to
5    allegations in a federal court action brought against him in the District of Utah by Fusion-io,[2]
6    Basile approached Violin Memory the very next day and entered into an agreement to invest in
7    the Company (through his fund Iron Capital) and become *its* CEO almost immediately after his
8    termination by Fusion-io. Basile brought defendant Doll and other personnel over with him from
9    Fusion-io, including Violin Memory's current Vice President of Corporate Marketing, Matt
10   Barletta ("Barletta"). However, Defendants did not publicly disclose Basile's appointment as
11   CEO for several months. Fusion-io alleged that, while Basile was still employed by Fusion-io,
12   he caused all of his emails to be forwarded from his Fusion-io email account to his own personal
13   email account, and to be erased from Fusion-io's servers. Moreover, Basile allegedly
14   manipulated his outgoing emails from his personal email account, which he used to conduct
15   Fusion-io business, to make it appear that they originated from his Fusion-io email account. In
16   this way, Basile allegedly created a "closed loop" of emails where he could conduct Fusion-io's
17   business without Fusion-io ever being able to retain records of those emails.

18        54.     In addition, Fusion-io alleged that when he left Fusion-io, Basile took substantial
19   trade secrets concerning Fusion-io's customers, potential customers, vendors, investors, potential
20   investors, technology, and marketing plans. Fusion-io allegedly only discovered that Basile was
21   in negotiations to become Violin Memory's secret CEO when an e-mail from Defendant
22   Newman discussing those plans was copied to the Fusion-io email address of Barletta (whose
23   email account at Fusion-io was still active despite his departure).

24        55.     Fusion-io also alleged that Basile had misappropriated an ioSAN Prototype Card
25   belonging to Fusion-io and containing valuable technology from which a competitor could
26   reverse engineer Fusion-io's trade secrets.

27

28    [2]     *Fusion Multisystems, Inc. v. Basile*, No. 2:09-cv-00426 (D. Utah) (filed May 8, 2009).

- 17 -

56. The Fusion-io lawsuit against Basile was settled on undisclosed terms.

C. **Defendants Cause Violin Memory to Issue Materially False and Misleading Statements in the Years Preceding the IPO**

57. For at least four years preceding the IPO in September 2013, Defendants, spearheaded by Basile, consistently misstated Violin Memory's revenues, business prospects, and competitive position.

58. The misstatements identified in this section must be interpreted in light of the Company's actual results, which did not become public until after the IPO but were well known to Defendants during all relevant times. Based on Violin Memory's financial results publicly filed with the SEC, the Company had the following revenues in the years preceding the IPO:

| Year ended January 31, | Revenues |
|---|---|
| 2010 | $638,000 |
| 2011 | $11,397,000 |
| 2012 | $53,888,000 |
| 2013 | $73,798,000 |

59. In April 2009, Basile, newly arrived at Violin Memory, sent Plaintiff and other shareholders a solicitation designed to persuade them to convert their shares of preferred stock into common stock, supposedly to facilitate a $6 million round of Series B venture-capital financing to be funded by Iron Capital, which was led by Basile himself. Iron Capital required that existing preferred shareholders such as Plaintiff be converted into common stock holders, as a condition of the financing. As a result, Plaintiff's preferred shares were diluted by over 82% into common shares, at the ratio of 1 new share of common stock for every 5.611 shares of preferred stock.

60. In connection with this solicitation, Basile promulgated projections for Violin Memory which foresaw revenues rising to $32 million for calendar year 2011 and to $63 million for calendar year 2012. The projections also forecast a net loss of $6.5 million for calendar year 2011 and net income of positive $7.7 million for calendar year 2012. Finally, the projections

- 18 -

forecast sales and marketing expenses of $8.8 million for calendar year 2011 and $11.3 million for calendar year 2012.

61.     Relying on these projections, Plaintiff agreed to convert his preferred shares into common shares at the stipulated exchange ratio.

62.     The above projections were materially false, however, in that Defendants did not actually plan to constrain sales and marketing expenses (and thus maintain net income at the projected levels) in 2011 or 2012.

63.     To the contrary, Defendants, led by Basile, planned and later executed a massive investment in sales and marketing, primarily airport advertising targeting enterprise IT professionals.    These ads were misconceived, knowingly failed to communicate Violin Memory's message, were driven by motives of self-flattery by Basile, and foreseeably did not succeed in increasing the Company's revenues.  As *Businessweek* reported on September 22, 2011, in an article entitled "The Inscrutable Mad Men of Silicon Valley":

> Donald Basile is the chief executive officer of Violin Memory, a startup in Silicon Valley that makes superfast data storage systems. You've probably never heard of the company, but there's a good chance you've seen its ads.  Over the past year, Violin has blanketed major U.S. airports with vibrant billboards and posters. *They say nothing about what Violin sells and tuck the company name down in a corner.  Instead, they're dominated by psychedelic imagery: a glowing piece of kryptonite, an LSD-inspired version of hyperspace, and one that's basically just colored ribbons around a naked woman.*  "Our demographic is people in their late 30s to early 50s," *Basile says*. "They grew up on *Star Trek*, *Star Wars*, and comic books. *They respond to three basic things: power, visions of the future, and sex.*"

> Basile represents one flank in a war for the attention of Joe Travelers, particularly Joe Travelers with purchasing authority for esoteric data center hardware. Starting in February, Violin has marched into area airports in Silicon Valley, Boston, New York, Salt Lake City, and Austin, Tex., displacing some of the far more sedate ads from Barracuda Networks, one of the biggest fish in airport tech advertising.    Barracuda sells security, spam filtering, and storage systems. *Executives from both companies admit that the vast majority of people cruising by the ads care little about data centers.  But the companies are out to prove that geeks can innovate in advertising,* and that even little guys can use marketing to punch above their weight.

> \* \* \*

> For the most part, though, Violin's ads are meant to influence people who purchase hardware at large corporations. "There are usually about five people at a company that make all the important decisions," Basile says. "We want to make sure there is an impression with those people over and over and over again."

- 19 -

*Although Violin hired outsiders to design and shoot the ads, Basile says he conceptualized them himself.*

If Violin is the plucky newcomer *to* the airport ad scene, then Barracuda is the old pro. The company, founded in 2003, has been blanketing U.S. airports since 2005 and is currently in 75 of them. Many of the ads, which are designed in-house, depict its black-and-blue systems along with a straightforward pitch about how the bland hunk of metal will help stop viruses, spam, or data loss. Michael Perone, chief marketing officer and co-founder of Barracuda, says the ads are meant to appeal to the common man as much as executives. "You might get too much spam and then go to your IT guy and say, 'I know the guys at Barracuda can fix that,'" he says.

\* \* \*

Peter Sealey, a former chief marketing officer of Coca-Cola (KO), gives Barracuda's campaign slightly higher marks than Violin's, saying Barracuda provides some meaningful information about its products. "When I do garner attention, I want to convey what I do," he says. *He likens the spectacle of the Violin ads to "ego campaigns" that actors in Hollywood sometimes demand of studios. "This is so the CEO and Violin employees can see their ads."*

Basile, originally an electrical engineer, dismisses the idea that his ads leave too much to the imagination. He brags that the kryptonite ad uses an actual prop from *Smallville*, a TV show about a young Superman. "You can't ignore it," he says. As for celebrating such iconography instead of Violin's name and products? "We thought, *'The name? Who cares?'" Basile says. "We want people to see the imagery."* [Emphases added.]

64. The "LSD-inspired version of hyperspace" and naked women that Basile came up with to symbolize the Company and devoted tens of millions of dollars to publicizing are emblematic of the sales and marketing boondoggle Violin Memory suffered under Basile. Unsurprisingly, actual sales and marketing expenses for calendar year 2011 (equivalent to fiscal 2012) were $21.5 million, not the conservative $8.8 million touted by Basile when trying to convince existing shareholders to dilute their shareholdings. By calendar year 2012 (equivalent to fiscal 2013), these expenses had ballooned to $61.1 million, *more than five times larger* than the $11.3 million projected. As a consequence of these inflated sales and marketing expenditures by Defendants, net income was vastly lower than projected by Basile in 2009: a $44.8 million loss in fiscal 2012 instead of a $6.5 million loss; and a staggering $109 million loss in fiscal 2013 instead of a $7.7 million profit.

65. Basile's misrepresentations to shareholders concerning sales and marketing expenses (and the effect they would have on income) constituted merely a prelude to a symphony of falsehoods conducted by Basile and other Defendants over the years.

- 20 -

66.     Thus, on December 30, 2010, Defendant Basile e-mailed a letter to shareholders stating: "Our current pace of revenue through 2010 and projection for 2011 puts us ahead of 3PAR . . . and [other] storage industry leaders of the past decade." This statement was materially false and misleading. According to its publicly-filed financial results, 3PAR's revenues in fiscal 2010 (ending March 31, 2010) were $194,000,000. Violin Memory's own revenues for 2010 and 2011 were only a tiny fraction—0.3% and 5.8%, respectively—of 3PAR's. Indeed, Basile's letter contradicted a communication six months earlier, from Defendant Rosenblatt to shareholders, stating that the Company was "on track to exceed $10 million revenue in the current year and over $20-$30 million in bookings." Basile's statement exaggerated Rosenblatt's projection (and the Company's achieved results) *by a factor of more than 20*.

67.     In June 2011, Defendant Basile commented on the recent IPO by competitor Fusion-io to *Fortune* magazine: "We understand they [Fusion-io] told Wall Street they're soon moving to $50 million quarters, which is something we plan to hit by Q4." However, Violin Memory's results for the entire fiscal year ending January 31, 2012 were only $53,888,000. Basile thus had exaggerated the Company's prospects *by a factor of at least 4*. Indeed, at the time of this statement, Violin Memory had received revenues of only $2,688,000 for the first quarter (ending April 30, 2011). Since then, it has come nowhere close to achieving a $50 million quarter.

68.     On June 7, 2011, *All Things Digital*, an online news source covering the computer and information technology field, reported that it had been informed by Company executives that Violin Memory "expects to do more than $100 million in revenue this year." The Company's actual revenues for the year ending January 31, 2012 were only $53,880,000. Thus, Defendants had exaggerated the Company's prospects *by a factor of at least 2*. Indeed, at the time of this statement, Violin Memory had received revenues of only $2,688,000 for the first quarter (ending April 30, 2011).

69.     On June 9, 2011, *Gigaom*, an online magazine covering news and trends in emerging technologies, reported that Basile had informed it that Violin Memory "can hit the

- 21 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  $100 million revenue mark this year, thanks to a perfect storm of price-performance
2  improvements and overall SSD excitement."

3      70.     On June 24, 2011, *The Business Journals*, a print and online provider of business
4  news to business professionals, reported that Violin Memory "anticipates $100M in revenue in
5  2011, and expects $50M a quarter by the end of the year, Basile said." In reality, the Company's
6  revenue was half this amount on an annual basis, and revenue for the entire year was only
7  $53,880,000. Basile thus had exaggerated the Company's prospects *by a factor ranging from 2*
8  *to 4*. Again, at the time of this statement, Violin Memory had received revenues of only
9  $2,688,000 for the year.

10     71.     On July 20, 2011, *Dow Jones VentureWire*, an online provider of coverage of
11  venture capital-backed technology companies, reported that Violin Memory "will select a bank
12  [for its IPO] in September, according to Basile" and that "Basile expects revenue this year to top
13  $100 million." Again, Basile exaggerated the Company's prospects *by a factor of 2*. Once
14  again, Violin Memory had received only $2,688,000 in revenues thus far that year.

15     72.     On September 22, 2011, *Businessweek* reported that Basile stated that the
16  "company will sell $100 million of systems this year." Again, the prospects were exaggerated
17  by Basile *by a factor of 2*. By the time of this statement, Violin Memory had received revenues
18  of only $9,800,000 for the first two quarters (ending July 31, 2011).

19     73.     On October 19, 2012, *Bloomberg News* reported that Hewlett-Packard had ended
20  its storage system reseller arrangement with Violin Memory, in favor of 3PAR, which Hewlett-
21  Packard had acquired in 2010. *Bloomberg* stated: "Violin Memory had sales of $100 million
22  last year, according to Chief Executive Officer Don Basile." Basile's statement was objectively
23  false and misleading. Violin Memory's revenues "last year"—or the year ending January 31,
24  2012—were only $53,880,000. Basile thus had exaggerated the Company's actual results *by a*
25  *factor of 2*.

26     74.     Basile repeated his false account of Violin Memory's recent performance to
27  *Wired* magazine, which reported on October 23, 2012 that the "company topped $100 million in
28

- 22 -

revenues last year, according to . . . CEO Don Basile." Again, Basile's statement falsely stated the Company's performance *by a factor of 2*.

75.     The Defendants' statements to Violin Memory's shareholders and the public set forth above were false and misleading and therefore breached Defendants' fiduciary duties to shareholders. The true facts, which Defendants well knew but concealed from shareholders during the relevant period were that: (1) Violin Memory could not and would not achieve $50 million in revenues per quarter for the foreseeable future; (2) Violin Memory could not achieve $100 million in revenues per year for the foreseeable future; and (3) Violin Memory had not achieved anywhere close to $100 million in revenues per year.

**D.     Defendants Grant "Insane" Compensation to Basile**

76.     At the same time that Basile, with Defendants' acquiescence, was exaggerating the Company's results to shareholders and the financial press by factors ranging from 2 to 20, he also was conspiring to divert a large swatch of Violin Memory's precious cash to himself—again with all Defendants' acquiescence. As noted above, for the Company's unsustainable performance during 2012 and early 2013—losses of $109 million on revenues of $73 million—Basile was granted the astonishing sum of $18,910,938 in total compensation. Doll and Sindelar received $5.0 million and $1.8 million, respectively. Thus, *twenty-five cents of every dollar the Company took in went into Basile's pocket. Thirty-five cents of every dollar went into the pockets of defendants Basile, Doll, and Sindelar.*

77.     As one financial commentator noted, in describing the Company's "failed" public offering in September 2013: "The rapid losses [at Violin Memory], long road to profitability, and outright insane management compensation makes it easy to skip this offering. *Note that Violin Memory awarded its CEO the equivalent of 3% of its current market capitalization over the past year, an insane amount.*" (Emphasis added.)

**E.     Defendants Issue Materially False and Misleading Statements and Further Manipulate Shareholders in Connection with the Company's IPO**

78.     Defendants' long pattern of deceptiveness and manipulation of shareholders repeated itself in the months leading up to the IPO connection with the IPO.

79.     In January 2013, a market for trading in common shares of Violin Memory was

- 23 -

created on SharesPost. SharesPost is an online platform to facilitate transactions in pre-IPO shares of emerging companies, connecting parties who wish to invest with parties, such as Plaintiff at that time, who wish to sell their shares. SharesPost is a member of both the Financial Industry Regulatory Authority (FINRA) and the Securities Investor Protection Corporation (SIPC). Defendants never informed Plaintiff or other non-inside shareholders about this development. Plaintiff independently discovered the arrangement with SharesPost and registered his shares for sale. However, by this time, trading in Violin Memory shares were in a lull, and there was an insufficient market into which Plaintiff could sell his substantial holdings.

80. Then, in the month before the IPO, Defendants arranged to secretly dilute existing common stockholders, including Plaintiff, in a vain attempt to support a higher stock price for the Offering. Thus, on September 6, 2013, Defendants obtained "written consent" from large insider shareholders that allegedly was sufficient to take action on behalf of all shareholders without a formal meeting. The action taken by this "written consent" was to effectuate a reverse 2:1 stock split, which reduced in half the holdings of every single common stockholder, including Plaintiff. The reverse split became effective on September 12, 2013. As a consequence, existing shareholder's holdings, including Plaintiff's, were cut exactly in half.

81. Defendants' intention to dilute shareholders in half were deliberately concealed from shareholders. Plaintiff was not informed of the 2:1 reverse split until on or about October 8, 2013—over a month after the fact and two weeks after the IPO—in a letter sent by Defendants on Company letterhead. By this time, and in reliance on Defendants' representations and promises, Plaintiff had executed a 180-day "lockup" agreement at Defendants' insistence and purportedly as a condition of the underwriters agreeing to conduct the Offering. Pursuant to this lock-up, Plaintiff became unable to dispose of his common shares of Violin Memory until 180 days following the IPO—or approximately March 26, 2014. Thus, while VMEM has plummeted in value, effectively wiping out Plaintiff's seven-year investment of almost a quarter of a million dollars, Plaintiff has been unable to protect himself by selling his shares on what market strength existed following the IPO. Like other shareholders, the market value of his holdings has decreased approximately 67% from the IPO price of $9.00 per share.

- 24 -

82.    The Registration Statement itself was materially false and misleading. As an initial matter, it stated on the first page that "[t]he initial public offering price of our common stock is expected to be between $8.00 and $10.00 per share," thus implying that the Company's financials could realistically support a consistent price value in that range. But when the IPO was then officially priced at $9.00 per share, it promptly fell to $7.02 on its first day of trading. Moreover, before the IPO, Violin Memory common stock was trading on the SharesPost online platform at less than $4.00 per share.

83.    In the Registration Statement, which was personally signed by each one of them, Defendants represented that the United States federal government was one of its largest customers. In addition, Defendants disclosed that in fiscal 2013 (ending January 31, 2013) "[r]evenues from one customer, CompSec [Computer Security Solutions Inc.], represented 12% of our total revenue" and that "CompSec purchased our products for resale to the United States Federal Government." Similar figures for CompSec's purchases were given for previous reporting periods. The Registration Statement also stated that "The United States government can also suspend operations if Congress does not allocate sufficient funds to a particular agency or organization." The Registration Statement was entirely silent on the *actual current* risks, known at the time it was publicly released, that: (1) the federal government would be shut down after September 30, 2013; (2) all government procurement processes, including those affecting Company products, correspondingly would be halted; and (3) the Company could reasonably foresee much diminished federal government sales in its third quarter.[3] The Registration Statement also failed to disclose that Violin Memory's resellers who sold to the federal government *already* had been impacted.

84.    By contrast, it was not until December 9, 2013, when the Company issued its Form 10-Q discussing results for the third quarter ended October 31, 2013, that Defendants finally admitted that: "The increase in revenues [for 3Q14] was partially offset by a decrease in

---

[3] For example, on September 17, 2013, the U.S. Office of Management and Budget issued a highly-publicized memorandum to federal government agencies warning of a "potential lapse in appropriations" and advising agencies to prepare contingency plans.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    the shipments to the US Federal government as a result of shut down of the federal government

2    and its continued sequester related budget reduction. *We expect this slowdown in our sales to*

3    *the U.S. Federal government to persist in the near term.*" The "slowdown" belatedly

4    referenced in the third-quarter Form 10-Q was entirely known and foreseeable to Defendants

5    before the IPO and omitted from the Registration Statement.

6       85.    In addition, Defendants represented in the Registration Statement as follows:

7
8
- Violin Memory had "grown [its] business substantially for the past three years with total revenue of $11.4 million, $53.9 million and $73.8 million in fiscal 2011, 2012 and 2013, respectively and $51.3 million for the six months ended July 31, 2013."

9
10
- The Company "had a net loss of $16.7 million, $44.8 million and $109.1 million in fiscal 2011, 2012 and 2013, respectively and $59.2 million for the six months ended July 31, 2013."

11
12
13
14
- The Company "expect[ed] [its] research and development, sales and marketing, and general and administrative expenses to decrease as a percentage of revenue over time as we anticipate that we will realize economies of scale by increasing our customer base without direct incremental development costs and by reducing our manufacturing costs as a result of more favorable pricing terms as we increase the volume of our manufacturing orders."

15
16
17
18
19
20
- "We have pioneered a new class of persistent memory-based storage solutions designed to bring storage performance in line with high-speed applications, servers and networks. Our Flash Memory Arrays are specifically designed at each level of the system architecture starting with memory and optimized through the array to leverage the inherent capabilities of flash memory and meet the sustained high-performance requirements of business-critical applications, virtualized environments and Big Data solutions in enterprise data centers. . . . We have demonstrated that our persistent memory-based storage solutions provide low latency and sustainable performance with enterprise-class reliability, availability and serviceability through product testing and customer feedback. Our solutions enable customers to realize significant capital expenditure and operational cost savings by simplifying their data center environments."

21
22
- "To the extent more enterprise IT organizations recognize the benefits of flash memory in data center storage solutions and as the adoption of flash memory technology as primary storage increases, our target customer base will expand."

23       86.    With such statements, Defendants thus touted Violin Memory's significant and

24    growing sales to enterprise customers, its increasing revenues overall, and its expenses that,

25    while expected to grow, would diminish as a percentage of revenues.

26       87.    The Defendants' statements to Violin Memory's shareholders and the public in

27    the Registration Statement set forth above were false and misleading and therefore breached

28    Defendants' fiduciary duties to shareholders. The true facts, which Defendants well knew but

- 26 -

concealed from shareholders during the relevant period were that: (1) the Company's revenues depended significantly on sales to the federal government and such sales bore a strong likelihood of being radically curtailed (if not altogether halted) by the all-but-guaranteed shutdown of the federal government on October 1, 2013—*particularly inasmuch as two-thirds of Violin Memory's revenues each quarter consistently arise from sales during the last month of the quarter*; (2) the Company's losses would continue to grow faster than revenues for the foreseeable future, burning up its cash and casting grave doubt whether Violin Memory could continue as a going concern for more than four more quarters; (3) research and development expenses and sales and marketing expenses (including personnel expenses related thereto) were growing at an unsustainable rate, *including during the current quarter*, and were consuming an ever-growing share of revenues without growing sales; (4) customer growth was flat, with only one in three sales representatives successfully making a *single* sale per quarter; and (5) Violin Memory's sales of "enterprise" systems to corporate customers were flat or declining.

## F.    Defendants' Misconduct is Revealed

88.    On November 21, 2013, Violin Memory released its financial results for the third quarter of fiscal 2014 (ending October 31, 2013). The Company disclosed that it had received quarterly revenues of only $28.3 million, had experienced accelerating net losses of $34.1 million (or $.85 per share), had added only 32 new customers (from the efforts of its 96-member sales force), and had incurred a record $48.4 million in operating expenses (including $41.3 million in research and development, and sales and marketing, expenses), a huge increase from the previous quarter. In this release, the Company also disclosed that it projected fourth-quarter revenues of $30-$32 million.

89.    These results were significantly below the expectations of securities analysts based on the Registration Statement and Defendants' other public statements before November 21, 2013, including on the IPO "road show" to potential investors. The consensus among such analysts was that Violin Memory would achieve revenues of approximately $32 million, and only $.44 in losses per share, in the third quarter; and that fourth-quarter projections would be approximately $43 million.

- 27 -

90.     On the same day. Defendants Basile and Sindelar conducted an earnings conference call with securities analysts. On this call. these defendants disclosed *for the first time* that the shutdown of the federal government had impacted sales. Defendant Basile stated:

> Our revenue was negatively impacted by the slowdown in spending by the US federal government. . . . The federal government's fiscal year-end budget flush. the third quarter is typically an important quarter for us as we ended Q3 with tracking opportunities approximately $10 million. As a result of *unexpected* reprioritization of budgets ahead of the federal government shutdown. some of our forecasted opportunities were canceled and others were referred to future quarters pending funds being allocated to the project. Therefore. we ended the quarter with $2.6 million in bookings. *We're not including revenue from these deferred projects in our Q4 forecast, however, for lack of visibility and timing of the resolution of the US project.* [Emphases added.]

91.     Defendant Sindelar stated: "Product revenue was $21.4 million. up 11% year-over-year and down 9% from last quarter. which is *mostly attributed to the weakness in the federal government* . . . ." (Emphasis added.)

92.     Many securities analyst attended the earnings conference call—including representatives of the investment banks which had underwritten the Offering. Thus. Sindelar was asked by a Pacific Crest Securities analyst what portion the federal government's purchases contributed to third-quarter sales. He responded that it was *"roughly half of what we saw in the year-ago [third quarter]."* (Emphasis added.)

93.     Sindelar added: "[W]e said the Fed last year was 20% of our overall business. And for this year we had anticipated it to be somewhere around 10% to 15%. Given our outlook in the *fourth quarter, where we said we weren't forecasting any additional Fed business, we would end up roughly 5% for this year*." (Emphasis added.)

94.     The same analyst asked Basile. "Why aren't you seeing a greater adoption of [the flash memory] product? . . . Are you seeing any sort of fallout with government spending now impacting and causing some hesitancy among buyers on the commercial side?" Basile responded: *"I think in the third quarter it was clearly the Fed. . . . Overall, we believe the customer interest in considering all flash data centers and the adoption has increased, but it's hard to put the timing on that within a quarterly boundary for the increased adoption of all flash from the customer base."* (Emphasis added.)

95.     A Deutsche Bank analyst asked Sindelar "when you realized your quarter was

- 28 -

running so short of expectations during the course of the quarter and the course of the [IPO] road show [?] . . ." Sindelar, after noting that "our quarters are very much back-end loaded [and] *[w]e do about two-thirds of our revenue in the last month*, went on to state, falsely, that "frankly, with the government shut down for the first, say, three weeks of the quarter, it wasn't apparent to us what was going to happen out in the Fed until very late in the quarter."

96.     A JPMorgan Chase analyst pointed out to Basile that, even backing out all federal government revenues, the Company's projections for the fourth quarter suggested flat or even declining revenues from enterprise sales:

> I want to talk a little more about the fourth-quarter guidance. Just given that you have a pretty low base you're working with with [sic] the government in terms of the weakness in 3Q, I would imagine that typically is down, sequentially anyway, given the way the fiscal year works. But given it is so low already, if we ex out that dimension as well as the PCIe card, it really suggest that this flattish guidance is indicating you're not really seeing that much uplift elsewhere. I just want to get a sense. Is there something going on with the sales cycle, competitive dynamic, or just the product itself that's resulting in less or limited uplift here in your enterprise business?

In response, defendant Basile *effectively conceded that near-term enterprise sales would not grow appreciably*:

> So, we remain confident in the long-term opportunity. It's a large and growing market for the transformation from enterprise storage to enterprise memory. However, it's important to note we are in the early stage of development in this market. Sales cycles are long. The competition is intense. And our results are likely to be both costly and lumpy as we establish this market share. . . .

97.     The Pacific Crest Securities analyst picked up where the JPMorgan Chase analyst had left off. At that point, the following exchange occurred:

> Analyst:  I had one quick follow-up. I'm still kind of scratching my head here trying to dissect what happened in the quarter. If I actually back out, make some pretty big assumptions relative to your federal contribution a year ago, take that down 50%, *it still implies the enterprise all flash memory system revenue was down sequentially*. So, can you just help explain why we would see and what would drive a sequential decline in your core all flash array business on the enterprise side this quarter?

> Basile:   Sure. So part of our prepared remarks dealt with our federal business. Federal we talked about how we were tracking $20 million in bookings—$10 million of bookings. And we actually resulted up $2.6

- 29 -

million. So *the shortfall in our third quarter is largely attributed to the federal government. Right?*

Analyst: So you were expecting the federal contribution going into be over 30% of the business?

Basile: This quarter? Let me think the math real quick. Give me a second. Not actually that high, but over 20%.

Analyst: *And is it unusual or is it seasonally do you see the enterprise business seasonally down this quarter?* Again, I'm just trying to understand why the enterprise business would be weak for you this quarter. I understand Fed. I get Fed. I get the math. But *it seems like it wasn't just the Fed that was weak for you this quarter.*

Basile: I think we felt it a solid quarter in the array business, excluding the Fed. The Fed is weighted towards Q3, the end of the federal fiscal year, which is the end of September. And as Cory pointed out earlier, it overall was 20% of our revenue last year, expected to be 10% to 15% of our overall yearly revenue weighted to this quarter. It's the primary contributor to being below our expectations. As we look at our long-term opportunity, our engagement with the clients around the array business and the transformation of our storage, we see the fundamentals remain intact and we are confident in that long-term opportunity. [Emphases added.]

98.     In reaction to the above disclosures—and Defendants' continuing obfuscations in connection with them—the market punished Violin Memory's stock price. On November 22, 2013, VMEM declined $2.89 per share, or 48.17%, to close at $3.11 per share, on unusually high volume. At this price, the entire Company was valued at $256 million—a small fraction of the implied valuation in connection with venture capital financing (approximately $850 million), projected value following the (aborted) 2012 IPO ($2 billion), and the 2013 actual IPO at $9 per share ($740 million).

99.     In the days following the Company's stock price crash, analysts and other members of the financial press criticized Violin Memory and questioned its candor and truthfulness.

100.    Thus, on November 22, 2013, JPMorgan Chase—which had been one of the *lead underwriters* of Violin Memory's IPO—*downgraded* the Company's stock from "overweight" to "neutral," cutting its price target from $9 to $5.50. The analyst whose question Basile had declined to answer stated that the year over year revenue growth of the Company was unlikely to

- 30 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

meet projections in the current climate, and that the deterioration in the revenue could not support a constructive stand on the stock. Two other lead underwriters also downgraded Violin Memory in short order. Deutsche Bank cut the Company from "Buy" to "Hold" and lowered its price target for VMEM from *$10 to $3.50*. Pacific Crest Securities cut the Company from "Outperform" to "Perform."

101.  The Pacific Crest Securities analyst whose questions were dodged by Basile later wrote in a research report that Basile's lack of clarity regarding enterprise sales of flash memory systems "adds to our concerns about Violin Memory's ability to sustain hypergrowth next year, particularly in the face of increasing competitive alternatives in the all-flash array space."

102.  The Company's denouement at the hands of Defendants was documented in an article entitled "Violin Memory—Warning Signs Continue As Financial Troubles Might Arise" on the respected investment website *Seeking Alpha* on November 26, 2013:

> Shares of Violin Memory (VMEM) are facing a violent sell-off in the wake of its third quarter earnings report. A soft quarter and a weak guidance combined with mounting losses make investors very nervous, merely two months after the public offering.
>
> Despite the significant correction, with operating assets valued at merely 1.0 times revenues, I remain very cautious. *The company has already built up a bad reputation following its public offering.* Given the very large current losses, Violin Memory might run into financial troubles as early as the end of next year.
>
> Third Quarter Results
>
> Violin Memory generated quarter revenues of $28.3 million, up 37.4% on the year before, and up 6.7% on a sequential basis. Revenues missed consensus estimates at $31.7 million.
>
> Net losses widened from $25.4 million to $34.1 million, as losses per share came in at $0.85 per share. Note that net losses in the second quarter totaled $30.6 million.
>
> Non-GAAP losses came in at $25.4 million, or at $0.63 per share. Analysts were looking for smaller losses at $0.45 per share.
>
> CEO Don Basile commented on the third quarter developments. *"Enterprise data center storage is in the early stages of a major transformation to an Enterprise Memory based infrastructure, and Violin is at the forefront of accelerating this transformation."*
>
> Looking Into The Results...
>
> While total revenue growth looks solid, it is nearly entirely explainable thanks to service revenues. Service revenues more than five-folded to $6.9 million as

- 31 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

product sales inched up by 10.8% to $21.4 million. The slower growth in product sales will undoubtedly limit service revenue growth going forward.

Gross margins inched up by 11 percent points to 54.3% of total revenues. The problem is ballooning operating expenses which rose by 41.3%, thereby outpacing revenue growth and totaling $48.4 million.

...And Ahead

Revenues for the fourth quarter are seen between $30 and $32 million. This implies that at the midpoint of the range, revenues are seen to be up 9.5% on a consecutive basis. Revenues are seen to grow 41.4% on an annual basis.

Non-GAAP gross margins are seen at 53-55%, while non-GAAP operating expenses are forecasted at $39-$40 million.

The guidance implies that operating losses are supposed to narrow compared to the third quarter.

*Analysts were looking for a much greater acceleration in revenue growth, expected to come in around $43.3 million. The huge discrepancy between the fourth quarter guidance and consensus estimates is a key driver for the sell-off on Monday.*

Valuation

Violin Memory ended its third quarter with $134.2 million in cash, equivalents and short-term investments. The company has no debt outstanding for a solid net cash position.

Revenues for the first nine months of the year came in at $79.6 million, up 56.4% on the year before. Losses widened to $93.3 million, indicating the company is burning through its current cash balances in about a year's time. At this pace, annual revenues are seen around $110 million.

Factoring in Friday's massive losses, with shares trading just above the $3 mark, the company values Violin Memory at about $250 million. Excluding the cash position, operating assets are valued at merely $115 million at this point. This values operating assets of the firm at about 1.0 times annual revenues.

Obviously, Violin Memory does not pay a dividend at the moment.

Some Historical Perspective

Back in September, shares of Violin Memory made their public debut. Bankers priced the offering at $9 per share, after which shares fell by more than 20% on their opening day.

Shares continue to fall and trading around $3 per share, shareholders have suffered losses of nearly 70% in merely two months' time.

While the company has grown from hardly reporting revenues in 2009, to an expected $110 million business in 2013, losses have been exploding as well. Losses came in at $109 million last year, to be followed by an equivalent loss this year.

Investment Thesis

- 32 -

*Investors are shocked based on the results and outlook which fell short on all metrics.*

\* \* \*

*Not only slower revenue growth, but higher costs are a big issue as well as losses are mounting. At this pace, the company is rapidly burning through its public offering proceeds. Even though the fourth quarter guidance implies that losses are set to narrow in the coming quarter, Violin might run into financial difficulties next year.* At the current pace, the company is burning through its entire cash balances in 12-18 months' time.

Yet investors are not focusing on narrowing losses going forward, as the bad news is dominating on Friday. *Comments from CEO Basile about customer additions and a transformation to an Enterprise Memory based infrastructure, are largely ignored.*

Back in September, I took a look at Violin Memory's prospects following its public offering. I concluded that a failed public offering could partially be attributed to *insane management compensation.*

I noted that high losses at a current rate of $140 million per annum, slower growth and very high management compensation were the drivers behind the "failed" public offering. Note that top three executives of the firm were granted a total of $26 million in compensation for this fiscal year on page 105 of Violin's S1-Filing. *The path to profitability and restoring trust will be a long road, making it easy for me to skip the offering given the many red flags. As indicated earlier, dilution might be real risk with current losses at an annual basis exceeding the current cash balances.* [Bolded emphases added.]

## G.    Damages to the Company

103.    All of these acts and omissions have caused significant injury to Violin Memory, for which Defendants should be held personally liable. Aside from ruining the Company's reputation for honesty and integrity, Defendants have exposed the Company to very expensive legal costs to defend, investigate, and pay judgment or settlements in multiple shareholder class action lawsuits, including three in this Court:

- *Tsai v. Violin Memory, Inc., et al.*, No. 3:13-cv-05486 (filed Nov. 26, 2013);
- *Schneider v. Violin Memory, Inc., et al.*, No. 3:13-cv-05515 (filed Nov. 27, 2013); and
- *McBrian v. Violin Memory, Inc., et al.*, No. 3:13-cv-05610 (filed Dec. 4, 2013).

In addition, Violin Memory was subpoenaed in the *Fusio-io* lawsuit against Basile and was required to spend hundreds of thousands of dollars or more to contest the subpoena. The payments to Defendant Donald G. Basile—which approach $50 million—have wreaked havoc on the Company's finances. The payments to Basile and other Defendants notwithstanding their

- 33 -

1  disloyalty are unjustified, constitute a waste of corporate assets, and have been similarly

2  detrimental to the Company's bottom line. The Company will face increased costs of borrowing

3  or raising equity capital in the future and will trade at a "liar's discount" in the public stock

4  market for the foreseeable future. On December 6, 2013, VMEM closed at $3.38 per share—

5  down more than 62% from its IPO price of $9.00 per share.

6                                    **DERIVATIVE ALLEGATIONS**

7       104.    Plaintiff brings this action derivatively in the right and for the benefit of Violin

8  Memory to redress injuries suffered by the Company as a direct result of the violations of state

9  law, including breaches fiduciary duty, corporate waste, and unjust enrichment, as well as the

10  aiding and abetting thereof, by Defendants.

11      105.    Violin Memory is named as a nominal defendant in this case solely in a derivative

12  capacity. This action is not a collusive one to confer jurisdiction that the Court would otherwise

13  lack. Plaintiff was a shareholder of Violin Memory during the transactions complained of herein

14  or his shares later devolved on him by operation of law. Plaintiff will adequately and fairly

15  represent the interests of similarly-situated Violin Memory shareholders in enforcing and

16  prosecuting the Company's rights. Prosecution of this action, independent of the current Board

17  of Directors, is in the best interests of the Company.

18      106.    The wrongful acts complained of herein subject, and will continue to subject,

19  Violin Memory to continuing harm because the adverse consequences of the actions are still in

20  effect and ongoing.

21      107.    The wrongful acts complained of herein were unlawfully concealed from Violin

22  Memory's shareholders.

23                                    **DEMAND FUTILITY**

24      108.    Plaintiff has not made any demand on the Board of Directors of Violin Memory to

25  institute this action since such demand would be a futile and useless act.

26      109.    Violin Memory's Board of Directors is comprised of Defendants Basile, Doll,

27  Newman, Bain, Lang, and Walrod. If only three members of this six-person Board of Directors

28  are found not to be independent or disinterested, demand is excused as futile.

- 34 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

110.    The current Board is dominated by the same Defendants whose wrongful acts set forth herein have evinced an abdication of the fiduciary duties of loyalty, due care, candor, and oversight. Such abdication included, but was not limited to:

(a)    misrepresenting and withholding material information from shareholders concerning the Company's revenues, expenses, and business prospects throughout the relevant period;

(b)    failing to maintain a system of internal controls adequate to stop such incidents;

(c)    allowing knowingly false material representations to be made to shareholders and federal regulatory agencies;

(d)    allowing the Company's financial statements and results from operations to be materially misleading;

(e)    structuring and timing the Company's IPO principally to confer benefits on Basile if the IPO were completed by September 30, 2013, and not in the best interests of the Company or its other shareholders; and

(f)    authorizing and causing the Company to divert a substantial portion of its revenues and cash to Basile, Doll, and Sindelar in the form of purported compensation to these defendants, at a time when the Company was experiencing hundreds of millions of dollars in growing losses.

111.    The misconduct of the Director Defendants alleged herein was not, and could not have been, the product of a valid or good faith exercise of business judgment.

112.    As detailed in this Complaint, the Director Defendants were directly involved in the misconduct challenged in this action, by virtue of their active roles in the misconduct and by virtue of their respective positions on the Board and its Committees, and/or as officers, principal shareholders, and affiliates of the Company.

113.    Defendant Basile is incapable of objectively considering presuit demand to bring these claims, inasmuch as he is the current CEO of Violin Memory, receiving extensive salary and other compensation (approximately $19 million in fiscal 2013), and thus depends upon his

- 35 -

position for his livelihood. Accordingly, Basile lacks independence due to his interest in maintaining his executive position at Violin Memory.

114. Defendant Doll is incapable of objectively considering presuit demand to bring these claims, inasmuch as he is the current COO of Violin Memory, receiving extensive salary and other compensation (approximately $4.9 million in fiscal 2013), and thus depends upon his position for his livelihood. Accordingly, Doll lacks independence due to his interest in maintaining his executive position at Violin Memory.

115. Defendant Newman is incapable of objectively considering presuit demand to bring these claims, inasmuch as he has business interests that conflict with the interests of Violin Memory and his shareholders. In particular, Newman's side company, Catalyst Operating, LLC, conducts business with Violin Memory, and both Newman and Catalyst have received substantial compensation from Violin Memory. In the Company's two previous fiscal years, Violin Memory paid Catalyst approximately $500,000 for "consulting" services, which directly redounded to the benefit of Newman. Moreover, in connection with the Catalyst relationship, Newman received stock and stock options from Violin Memory worth approximately $5 million at current market prices. As disclosed in the Registration Statement:

> In fiscal 2010 and 2013, we entered into a consulting agreement with Catalyst Operating, LLC, or Catalyst Consulting under which Catalyst performed business development, marketing and sales consulting services for us. Jeff J. Newman, one of our directors, is the Chief Executive Officer at Catalyst Consulting. We paid $0.3 million and $0.2 million during the year ended January 31, 2012 and 2013, for consulting services pursuant to this agreement. In addition, Mr. Newman was issued 1.1 million shares of common stock in fiscal 2010 and granted options to purchase 225,000 shares in fiscal 2011 and 200,000 shares in fiscal 2012 of our common stock at a weighted-average exercise price of $0.74 per share.

116. Basile, Doll, and Newman are further disqualified from objectively considering presuit demand to bring these claims by other business interests which are not aligned with Violin Memory's. Basile and Doll are owners and directors of BizzBlizz, Inc., which executed an agreement to provide $200,000 worth of search engine optimization and "reputation enhancement" services to Violin Memory in December 2011. Similarly, in August 2012, Defendants caused Violin Memory to invest $3 million in a company owned by Basile and Newman, RiverMeadow Software, Inc. Newman is the Chairman of the Board of RiverMeadow,

- 36 -

and Basile sat on its Board from August 2012 to August 2013. RiverMeadow accounted for $1.4 million of Violin Memory's revenues in fiscal 2013.

117. In fact, the Company has admitted that Director Defendants Basile, Doll, and Newman are not independent. Indeed, in the Company's Registration Statement, filed publicly with the SEC on September 16, 2013, Violin Memory stated as follows: "In August 2013, our board of directors undertook a review of the independence of our directors and considered whether any director has a material relationship with us that could compromise his ability to exercise independent judgment in carrying out his responsibilities. As a result of this review, our board of directors determined that, Messrs. Bain, Lang, Rosenblatt and Walrod are 'independent directors' as defined under the rules of the NYSE."

118. The Registration Statement went on to state:

[A]s a result of Mr. Rosenblatt's resignation from our board of directors effective as of the consummation of this offering, we are affording ourselves of the delayed compliance dates for companies listing on the NYSE in conjunction with an initial public offering. Under Section 303A.00 of the NYSE Listed Company Manual, a company listing on the NYSE in conjunction with an initial public offering *must satisfy the requirement that a majority of its board members be independent* directors within one year of its listing date and the company must have at least three members on its audit committee who are all independent directors within one year of its listing date. *Following this offering, our board of directors will consist of three independent directors and three non-independent directors*, and our audit committee will have two independent directors. After this offering, our board of directors will continue to evaluate our corporate governance principles and policies, including appointing an additional independent director following the completion of this offering that meets the qualification requirements for serving on our audit committee. [Emphases added.]

119. Thus, Defendants have conceded that a majority of the Company's Board of Directors is *not* independent.

120. The Audit Committee Defendants (Bain, Lang, and Walrod) similarly are disabled from objectively considering presuit demand to bring these claims, because as members of the Audit Committee during the relevant period, they face a substantial likelihood of liability for wrongdoing. The Audit Committee of the Board had oversight responsibilities over the full, fair, accurate, timely, and understandable reporting of the Company's financial results, as well as over the Company's internal controls with respect to accounting and financial reporting. It was their

- 37 -

1  failures of oversight as Audit Committee members that allowed the Company to misrepresent its
2  financial results as alleged herein.

3      121.    The Compensation Committee of Violin Memory's Board consists of the same
4  members as the Audit Committee (raising further "red flags" about the control procedures in
5  place at the Company). The Compensation Committee Defendants—Bain, Lang, and Walrod—
6  face a similarly substantial likelihood of liability for wrongdoing for misconduct, making them
7  incapable of objectively considering presuit demand to bring these claims. In particular, these
8  defendants approved lavish severance compensation for Defendant Basile that was out of all
9  proportion to the Company's results or Basile's contributions—including approximately $19
10 million in salary and other compensation in fiscal 2013, and stock awards related to the IPO
11 worth approximately $45 million at the IPO price of $9 per share, at a time when the Company's
12 entire annual revenues were only $73,798,000 and it had $109,005,000 in losses.    This
13 compensation awarded to Basile could have served no rational business purpose except to confer
14 personal largesse on a fellow company insider, one who, in fact, dominated and controlled other
15 Board members and management team members. Indeed, in personally enriching Basile in this
16 manner, the Compensation Committee members have demonstrated that their loyalty lies with
17 Basile, and not with the Company and its shareholders.

18     122.    Moreover, while Violin Memory and its shareholders have suffered substantial
19 damage and losses due to the deceit and deception committed by its insiders and the director
20 loyalty and oversight failings committed by its Board, the Director Defendants have not only
21 suffered no damages but, in fact, have greatly profited from their participation in the illegal
22 conduct. Aside from the tens of millions of dollars in "compensation" to Company insiders
23 Basile, Doll, and Newman, at least two of the other three Board members—Bain and Walrod—
24 received stock awards worth $750,000 *each* for causing the Company to misstate it financials,
25 conduct a failed IPO, ruin its reputation, and incur massive fees and expenses to defend against
26 investors' claims.

27     123.    In addition, and as a result of their concealments and falsifications, many of the
28 directors of Violin Memory held onto their positions of power, prestige and profit with the

- 38 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company. The Director Defendants avoided not only the exposure and embarrassment of their oversight failures, but also continued in their prestigious and profitable positions as directors.

124. Violin Memory has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused the Company to file any lawsuits against any Company officer or director or other persons responsible for that wrongful conduct to attempt to recover for Violin Memory any part of the damages it has suffered and will suffer thereby.

125. Moreover, despite having knowledge of the claims and causes of action raised by Plaintiff, the Director Defendants have caused the Board to refuse to seek to recover for Violin Memory for any of the wrongdoing alleged by Plaintiff herein. There is no evidence that the Board ever subjected any of the Defendants to disciplinary action, as required by the Company's own codes of conduct and other governing protocols.

126. Furthermore, the Violin Memory Board is still dominated and controlled by many of the same wrongdoers who continue to obscure their own misconduct, and will not take action to protect the interests of Violin Memory or its shareholders. The present Board has refused, and will continue to refuse, to institute this action for the foregoing and following reasons:

(a) The acts complained of herein constitute violations of fiduciary duties owed by the Board of Directors and these acts are incapable of ratification;

(b) Certain of the known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Board of Directors. Thus, the Board could not exercise independent objective judgment in deciding whether to bring or vigorously prosecute this action;

(c) The acts complained of herein are illegal and improper and thus are acts incapable of ratification;

(d) In order to bring this action for breach of fiduciary duty, abuse of control and fraud, the members of the Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their good friends and with whom they have entangling financial alliances, interests,

- 39 -

and dependencies, which they would not do.  They therefore would not be able to vigorously prosecute any such action;

(e)     The members of the Violin Memory Board, including each of the Director Defendants herein, receive substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board and their control of Violin Memory.  They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action. The Board members also have close personal or business ties with each other and are, consequently, interested parties and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves.

127.    Additionally, each of the Director Defendants faces a sufficiently substantial likelihood of liability for the misconduct alleged herein, and, thus, there is a reasonable doubt as to his disinterestedness in deciding whether pursuing legal action would be in the Company's best interest.

128.    Indeed, the adoption of the Sarbanes-Oxley Act ("SOX") also placed significant additional responsibilities on the Board of Directors, to improve corporate financial, accounting and internal controls, and to improve corporate financial responsibility and disclosure.  Thus, despite the Board's public posture of concern over good corporate governance, controls, disclosure integrity and overall compliance with SOX, in fact, at all relevant times, Defendants had caused or allowed the falsification of the Company's reported financial results. Any real compliance with SOX would have exposed Defendants' scheme, brought it to an end and resulted in embarrassing discharges and disclosures.  Thus, the Board did not enforce or comply with SOX, despite its legal obligation under U.S. law to do so, and they will not now sue themselves for their failures to achieve such compliance.

- 40 -

## COUNT I

### Derivatively Against All Defendants for Breach of Fiduciary Duty

129.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.    Defendants, and each of them, violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, and candor.

131.    Each of Defendants had actual or constructive knowledge that they had caused the Company to utterly lack the internal controls necessary to ensure the accurate and timely reporting of the Company's operating results and financial condition. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's best interests.

132.    Defendants failed to supervise, and to exert internal controls over, and consciously disregarded their responsibilities involving the Company.

133.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, including their gross mismanagement and abuse of control, Violin Memory has sustained significant damages, including the cost of defending against numerous lawsuits. As a result of the misconduct alleged herein, Defendants are liable to the Company.

134.    Plaintiff, on behalf of Violin Memory, has no adequate remedy at law.

## COUNT II

### Derivatively Against Defendants Basile, Doll, and Sindelar for Unjust Enrichment

135.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

136.    By their wrongful acts and omissions set forth herein, each of these Defendants was unjustly enriched at the expense and to the detriment of Violin Memory, through, among other things, total compensation approximating $18.9 million to Basile, $5.0 million to Doll, and $1.8 million to Sindelar in fiscal 2013, at a time when the Company's entire annual revenues were only $73,798,000 and it had $109,005,000 in losses.

-41-

137. Plaintiff, as a shareholder of Violin Memory and on its behalf, seeks restitution from these defendants and an order of this Court disgorging all profits, benefits, and other compensation obtained by them as a result of their wrongful conduct and fiduciary breaches.

138. Plaintiff, on behalf of Violin Memory, has no adequate remedy at law.

### COUNT III

### Derivatively Against All Defendants for Corporate Waste

139. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

140. Defendants, and each of them, violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, and candor.

141. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and ongoing throughout the relevant period. As a result, the resulting harm to the Company has been continuous, connected, and ongoing.

142. As a result of the misconduct set forth herein, each of the Defendants wasted the corporate assets of Violin Memory by: (1) authorizing, approving, and allowing the payment of excessive compensation and other payments to defendants Basile, Doll, and Sindelar; (2) subjecting the Company to inappropriate costs and expenses, and damages to its reputation and its ability to raise further capital, in connection with the failed IPO in September 2013; and (3) causing the Company to incur potentially millions of dollars in legal liability and/or legal fees and costs to defend the Company against actions arising from the Defendants' conduct.

143. As a result of the waste of corporate assets, the Defendants are liable to the Company.

144. Plaintiff, on behalf of Violin Memory, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.  Determining that Plaintiff fairly and adequately represents the interests of Violin Memory in enforcing its rights against Defendants herein.

- 42 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

B.   Against all Defendants and in favor of Violin Memory for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties.

C.   Awarding to Violin Memory restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other monies obtained by Defendants:

D.   Declaring that Defendants' improper payments to themselves through the Company's coffers of unearned bonuses, compensation, stock awards, fees, and other illicit transfers — as well as any assets or property acquired with such payments — be held in constructive trust for the Company's benefit;

E.   Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting Defendants' assets until the Company can recoup all of the monies improperly transferred to Defendants:

F.   Directing Violin Memory to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions amendments to the By-Laws and Articles of Incorporation and taking such other action as may be necessary to place before shareholder for a vote the following Corporate Governance Policies, including measures to:

   i.   Strengthen the Board's supervision of disclosures, regulatory compliance, and related-party matters by the Company, including the development of procedures for greater shareholder input into the policies and guidelines of the Board and Audit Committee;

   ii.  Terminate defendants Basile and Doll from their positions as CEO and COO:

   iii. Terminate defendants Basile, Doll, and Newman as members of Violin Memory's Board of Directors;

- 43 -

iv. Require Violin Memory to immediately configure its Board to have a majority of independent directors:

v. Terminate defendants Bain, Lang, and Walrod as members of Violin Memory's Audit Committee and Compensation Committee:

vi. Mandate that the Audit Committee meet to review the Company's compliance with legal, regulatory, and ethical norms, including "best practices" in connection with public disclosures:

vii. Permit Violin Memory's non-corporate shareholders to nominate at least four new candidates to the Board of Directors: and

viii. Appropriately test and audit Violin Memory's regulatory compliance with SEC and other governmental regulations.

G.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses: and

H.    Such other relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 12, 2013

THE MEHDI FIRM, PC

AZRA Z. MEHDI

One Market
Spear Tower, Suite 3600
San Francisco, CA 94105
Telephone: (415) 293-8039
Facsimile: (415) 293-8001
azram@themehdifirm.com

*Local Counsel for Plaintiff*

KAHN SWICK & FOTI, LLC
Albert M. Myers (to seek phv admission)
Melinda A. Nicholson (to seek phv admission)
Michael J. Palestina (to seek phv admission)
206 Covington Street
Madisonville, LA 70447
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

*Attorneys for Plaintiff Troy Lowry*

- 44 -

## VERIFICATION

I, Troy Lowry, hereby verify that I am a shareholder of Violin Memory, Inc. (the "Company") and am ready, willing, and able to pursue this shareholder derivative action in the hopes of improving the Company and recovering damages for the Company caused by Defendants' misconduct. I have reviewed the allegations in the foregoing Shareholder Derivative Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason I believe them to be true. Having received a copy of the foregoing complaint, and having reviewed it with my counsel, I hereby authorize its filing.


_____
Troy Lowry

Dated: December 10, 2013